## 39843. GODFREY v. FRANCIS.

SMITH, Justice.

This is a habeas corpus case. Robert Franklin Godfrey shot and killed his wife and mother-in-law and struck his daughter with the same shotgun. He was convicted of murder and aggravated assault

and received two sentences of death. We affirmed in *Godfrey v. State,* 243 Ga. 302 (253 SE2d 710) (1979). The two death sentences were subsequently vacated by the United States Supreme Court. *Godfrey v. Georgia,* 446 U. S. 420 (100 SC 1759, 64 LE2d 398) (1980). On remand, this court directed that the case be sent back to the trial court for either imposition of a life sentence or for a resentencing trial. *Godfrey v. State,* 246 Ga. 359 (274 SE2d 339) (1980). A second sentencing trial was held in Polk County Superior Court and Godfrey was again sentenced to death. On direct appeal, we concluded that the two statutory aggravating circumstances, the murders of the two women, were mutually supporting, vacated the death penalty for the murder of his wife Mildred Godfrey, and affirmed the sentence of death for the murder of Chessie Wilkerson, his mother-in-law. *Godfrey v. State,* 248 Ga. 616 (284 SE2d 422) (1981). Godfrey then filed for a writ of habeas corpus, which was denied. We subsequently granted his application for probable cause to appeal. We affirm. A detailed statement of the facts in this case may be found at *Godfrey v. State,* 243 Ga. 302, supra.

1. In his first enumeration Godfrey contends that he did not receive effective assistance of counsel, in that no challenge to the traverse jury pool was filed and the challenge to the composition of the grand jury was not timely filed. The habeas court found as a fact that prior to Godfrey's first trial, counsel filed numerous motions and that among them was a challenge to the composition of the grand jury. This motion was dismissed as untimely because Godfrey had already been indicted. This dismissal was upheld on direct appeal. *Godfrey v. State,* 243 Ga., supra at 305.

It was the rule in Georgia at the time of Godfrey's indictment that a challenge to composition of the grand jury must be filed prior to the return of the indictment or it will be deemed waived.[1] *Sanders v. State,* 235 Ga. 425 (219 SE2d 768) (1975), cert. denied, 425 U. S. 976 (96 SC 2177, 48 LE2d 800) (1975). A challenge cannot be asserted as a ground for writ of habeas corpus, unless it is shown in the petition that cause exists for being allowed to pursue the objection to the grand jury's composition after the conviction and sentence have otherwise become final. OCGA § 9-14-42(b)(Code Ann. § 50-127). Under federal law a showing of actual prejudice is required, as well as a showing of cause, to allow the untimely challenge. Francis v.

---

[1] Pursuant to Rule II(A)(5) of the Georgia Unified Appeal Procedure, 246 Ga. A-1 (1980) (Code Ann. Ch. 27-25 Appendix), a defendant in a death penalty case may challenge the array of his grand jury after indictment. See *Walraven v. State,* 250 Ga. 401, 405 (297 SE2d 278) (1982).

Henderson, 425 U. S. 536 (96 SC 1708, 48 LE2d 149) (1976); Lumpkin v. Ricketts, 551 F2d 680 (5th Cir. 1977). Where no cause is shown, mere allegation that a jury challenge was not timely filed will not support a claim of ineffective assistance of counsel. *Zant v. Gaddis,* 247 Ga. 717 (3) (279 SE2d 219) (1981).

Godfrey submits evidence to support this enumeration in the form of an affidavit containing unanalyzed data as to composition of the grand jury array. This data on its face neither confirms nor contravenes his contention. He asserts that he has thus established cause in that it is likely that his timely motion challenging the composition of the grand jury would have succeeded. However, he has not shown cause as contemplated by the statute and the cases interpreting it and Godfrey cites no authority in support of his contention. Therefore we find that Godfrey has not shown cause why he should be allowed to proceed with an untimely challenge to the composition of the grand jury.

As to the traverse jury question, Godfrey's counsel testified that he considered a challenge but he believed that it would be dismissed and thus unsuccessful. Appellant has not presented any evidence to support a contrary conclusion and merely alleges that the traverse jurors were selected by a discriminatory system which disproportionately excluded blacks, women and persons aged 18 to 30. The habeas court found that counsel's failure to file a challenge to the traverse jury was a tactical decision. We cannot find that this was a clearly erroneous result. *Hawes v. State,* 240 Ga. 327, 329 (240 SE2d 833) (1977). Neither defense counsel's failure to timely challenge the composition of the grand jury nor his tactical decision not to challenge the traverse jury array resulted in denial of Godfrey's Sixth and Fourteenth Amendment right to effective assistance of counsel. *Hudson v. State,* 250 Ga. 479 (8) (299 SE2d 531) (1983). We find no merit in this enumeration.

2. Godfrey enumerates as error issues raised and reviewed by this court on direct appeal in his enumerations numbered 2, 4-8, 11, 16, 18, 20, and 21. These issues will not be considered again on this appeal from denial of a petition for a writ of habeas corpus. *Zant v. Campbell,* 245 Ga. 368 (265 SE2d 22) (1980), cert. denied, 449 U. S. 891 (101 SC 252, 66 LE2d 118) (1981).

3. In his third enumeration Godfrey asserts that the trial court's charges to the jury concerning the elements of intent and malice impermissibly shifted the burden of proof to him, contrary to the rule established in Sandstrom v. Montana, 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979). At Godfrey's trial on the issue of guilt, the court instructed the jury: "the acts of a person of sound mind and discretion are presumed to be the product of a person's will, but the

presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted." Godfrey contends that the instruction was unconstitutional because it permitted the jurors to conclude that they could find the requisite element of intent unless appellant provided more than some evidence to the contrary, thereby shifting the burden of proof of this element to appellant.

In *Hosch v. State,* 246 Ga. 417 (271 SE2d 817) (1980), decided after Godfrey's trial and conviction, we examined a similar although not identical charge: " 'I charge you that the law presumes that a person intends to accomplish the natural and probable consequences of his act, and if a person uses a deadly weapon or instrumentality in the manner in which such weapon or instrumentality is ordinarily used and thereby causes the death of a human being, the law presumes the intent to kill. These presumptions may be rebutted.' " Id. at 419. We found that although this charge was not error, we disapproved its continued use. "Absent explanatory language the charge should not be cast in terms of the 'The law presumes,' a phrase which standing alone, as the United States Supreme Court has pointed out in Sandstrom, supra, is subject to misinterpretation by the jury." Id. at 420. Our approved charge on intent substitutes "you may infer," for language stating a presumption. However, as we said in *Hosch,* no conclusive presumption is charged when the jury is also adequately instructed that the presumption may be rebutted. See OCGA § 16-2-5 (Code Ann. § 26-604); *Wilson v. Zant,* 249 Ga. 373 (290 SE2d 442) (1982). In view of the trial court's charges on the presumption of innocence, the burden of proof, reasonable doubt, and intent as a jury question, we find that the jury could not have interpreted the charge as shifting the burden of persuasion to Godfrey. *Johnson v. State,* 249 Ga. 621 (1) (292 SE2d 696) (1982). Where, as here, instruction on rebuttal is incorporated into the charge, the burden of persuasion on the element of intent is not shifted to the accused in violation of the Fourteenth Amendment's due process requirement that the state prove every element of a crime beyond a reasonable doubt.

As to malice, the trial court charged: "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Godfrey contends that this instruction violates due process, in that the jury may have concluded that the implication of malice was mandatory or that Godfrey had to prove lack of malice. We have previously examined and approved this

charge. See *Franklin v. State,* 245 Ga. 141 (9) (263 SE2d 666) (1980).

4. In his ninth enumeration, Godfrey contends that the trial court failed to timely determine his status as an indigent and thus violated his right to due process of law and effective assistance of counsel. Godfrey was arrested on September 21, 1977. Counsel was appointed the next day, pending a determination of his indigency, which was resolved on December 22, 1977. He was tried beginning March 6, 1978. Godfrey was represented by counsel from the day after his arrest and throughout the period leading up to and including his trial. There is no merit in this enumeration.

5. In his tenth enumeration, Godfrey complains that the compelled pretrial psychiatric and psychological examinations conducted without presence of counsel violated his right against self-incrimination protected under the Fifth and Fourteenth Amendments and his right to counsel under the Sixth Amendment, citing Estelle v. Smith, 451 U. S. 454 (101 SC 1866, 68 LE2d 359) (1981). He also contends that he was entitled to, but was not given, a separate Miranda warning prior to the psychiatric interview.

Prior to Godfrey's first trial, counsel filed a motion for a private psychiatric examination at government expense or, alternatively, for government transportation for a private examination at Godfrey's expense. The motion in the alternative was granted and the state requested an examination at a state facility following the private exam. However, the order was written to allow Godfrey to be examined at whichever facility could first see him in order to minimize delay. The state facility had an opening the following day and Godfrey was transported there before notification was sent to counsel that he was on his way. At the state facility he was reminded that he need not answer any questions, but he agreed to be examined and the interview proceeded. Godfrey was later examined by a private psychiatrist and testimony as to both examinations was presented at trial. Now Godfrey claims that the state examination was conducted without adequate safeguard of his right against self-incrimination.

The habeas corpus court found Estelle to be inapposite and we agree. Estelle involved a defendant who did not raise the issue of sanity or otherwise introduce psychiatric evidence. Here, Godfrey moved to obtain a private examination and the state examined him only to be in position to rebut, should Godfrey later choose, as he did, to present testimony concerning his private examination. Thus it was Godfrey who initiated inquiries into his mental condition and proposed psychiatric evaluation. Estelle does not address this issue and does not preclude an examination by the state where the defendant has clearly demonstrated his intent to introduce

psychiatric evidence. The Estelle opinion carefully distinguishes such cases: "Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. [Cits.]" 451 U. S. at 465.

Nor did Godfrey have a constitutional right to the presence of counsel during the state's psychiatric examination. He asserts no compelling reason for counsel's presence, and we have never ruled that counsel must be present during psychiatric evaluation ordered by a trial court. See *Strickland v. State,* 247 Ga. 219 (275 SE2d 29) (1981); *Presnell v. State,* 241 Ga. 49 (243 SE2d 496) (1978). It has been observed that an attorney present during a psychiatric interview could contribute little and might seriously disrupt the examination. See Estelle v. Smith, supra at n. 14. Godfrey was given a full and proper Miranda warning at the time of his arrest, but it was not necessary to remind him (although the state did so) that he need not answer any of the interviewer's questions before the state psychiatric examination. A full, separate, second warning was not necessary. *Anglin v. State,* 244 Ga. 1 (257 SE2d 513) (1979).

6. In his twelfth enumeration Godfrey contends that it was error to allow into evidence his post-arrest statements to police. He says that these statements were made without benefit of Miranda warnings, and without a "voluntary waiver," in that he presented testimony of his psychotic condition at the time of the murders. We take this to mean that he intends that the statements made after he had been arrested and advised of his Miranda rights should have been suppressed because he was incapable of voluntarily waiving his rights to remain silent and to presence of counsel and could not have done so because of an alleged psychotic "dissociative state," to which an expert testified in Godfrey's behalf. The specific statements objected to are not included in the appellant's brief and no reference or citation is made to the record.

Godfrey made several statements to police shortly after the murders. The first occurred when he called the county jail at about 8:30 p.m. on September 9, 1977. He talked to an official there who testified that Godfrey said he had just killed his wife and mother-in-law. He asked that the sheriff be notified and sent out to get him. He spoke plainly, gave his telephone number and offered detailed directions to his location. At about 8:35 p.m. two officers

arrived on the scene. One testified that Godfrey was sitting beside a tree about fifty yards from the trailer where he lived. As the officer approached, Godfrey greeted him by name and said, "There's no need of going into the trailer. They're dead. I killed them." He pointed out the murder weapon, a shotgun, where he had placed it in the fork of a nearby apple tree. After the other officer searched the house trailer and discovered the victims, Godfrey was placed under arrest and advised of his Miranda rights. He was placed in a county police car and at the time appeared to be calm and composed, according to the arresting officer.

At the police station Godfrey asked for and received a cup of coffee. While he drank it he spoke to another policeman by name and said, according to testimony, "Mack, I've done a hideous crime, but I've been thinking about it for eight years. I'd do it again." Godfrey does not contend that this statement was the result of any questioning, interrogation, or suggestion by the police, or that the totality of the circumstances and context of his custody might have overborn his will. At no time pertinent to this enumeration did Godfrey invoke any of the Miranda rights. At the county jail he was observed upon arrival at about 10:30 p.m. by the jailer, who testified that Godfrey appeared to be in control of his faculties and "quite calm."

Introduction of these statements was not objected to at trial and no Jackson v. Denno, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964), hearing was held to determine their voluntariness. Our review of the record shows that none of the statements recounted above were made in violation of the rights specified by Miranda. Godfrey made several incriminating statements at or near the time of his arrest that were properly admitted into evidence. There is no question of waiver in the statements made in his telephone call or to officers as they arrived on the crime scene, since Godfrey made these statements before a Miranda warning could be given. The statement at the police station was not a response to interrogation and there is no question but that it was freely and voluntarily made. See Rhode Island v. Innis, 446 U. S. 291 (100 SC 1682, 64 LE2d 297) (1980). There is no merit in this enumeration.

7. In enumeration thirteen, Godfrey asserts that he was denied a fair trial because the court "assigned the task of swearing the jury to the prosecutor; admitted improper testimony in connection with the government's rebuttal to the insanity defense; allowed the introduction into evidence of gory color photographs of the crime scene and the bodies as well as graphic testimony concerning the mutilation of the bodies; admitted a statement of Godfrey in violation of his Miranda rights; allowed the prosecutor to pose

improper hypotheticals . . .; allowed the testimony of prior bad acts by Godfrey; and refused to give the jury an instruction on manslaughter, Sansone v. United States, 380 U. S. 343 (1965). Furthermore, the prosecutor's closing remarks consisted of a series of improper and prejudicial remarks. United States v. Garza, 608 F2d 659 (5th Cir. 1979)." This is the substance of the enumeration. There are no citations to the record and no argument follows in support of the allegations of error.

The statute requiring the trial judge to administer the oath to jurors became effective July 1, 1979, over a year after Godfrey's trial in March 1978. See Ga. L. 1979, p. 1048; OCGA § 15-12-132 (Code Ann. § 59-704.1). The question of evidence of Godfrey's psychiatric condition is taken up in section five of this opinion, supra. The photographs of the victims were admissible under a long standing rule in this state. See *Ellis v. State,* 248 Ga. 414 (283 SE2d 870) (1981); *Johnson v. State,* 239 Ga. 324 (236 SE2d 661) (1977). Godfrey's statement to a police officer at the station is reviewed in enumeration six, supra. The hypotheticals posed by the prosecutor were not improper, in that the facts assumed in the hypotheticals were consistent with testimony already in evidence. *Yarbrough v. Yarbrough,* 202 Ga. 391, 404 (43 SE2d 329) (1947). The bad acts complained of were threats made toward the victims, evidence of which is admissible, as it was used here, to show identity, purpose, and intent. *Shafer v. State,* 191 Ga. 722 (1) (13 SE2d 798) (1941). The clause in the enumeration regarding a charge on manslaughter is so vague and ill-defined that we cannot respond to it, except to say that the evidence did not warrant such a charge. *Murray v. State,* 214 Ga. 350 (104 SE2d 905) (1958). Finally, the petitioner provides no examples of the closing argument complained of and thus no evidence from which a determination might be made of the detrimental effect of these remarks. For these reasons we find no merit in this enumeration.

8. In his fourteenth enumeration Godfrey asserts that the resentencing trial was conducted in such a way that the jury was not able to make an informed decision, free from emotion and passion, based upon the free flow of evidence, and that as a result he was denied a fair trial. He bases this enumeration on his contentions that: the state introduced evidence "not relevant to the particular aggravating circumstance before the jury," inflammatory closing remarks by the prosecutor which appealed only to the passion of the jury; the court limited mitigation evidence offered by Godfrey; the court permitted testimony by a state psychiatrist who had examined Godfrey, excluded testimony of a member of the Georgia American Civil Liberties Union, and admitted into evidence Godfrey's

statement to one of the arresting police officers. None of these contentions are supported by argument, citations to pertinent authority, or citations to the record.

The aggravating circumstance contended by the state to exist in this case and charged by the resentencing court was that "the offense of murder was committed while the offender was engaged in the commission of another capital felony, namely murder." The jury, in response to this charge and the evidence, found that the murder was committed while Godfrey was engaged in the commission of another capital felony. See OCGA §§ 17-10-30 (b)(2) (Code Ann. § 27-2534.1), 17-10-31 (Code Ann. § 26-3102).

From the memorandum of law submitted to the superior court in support of Godfrey's petition for a writ of habeas corpus it appears that this is the "particular aggravating circumstance" alluded to in Godfrey's brief to this court. His memorandum argues on this point that testimony of the state psychiatrist who examined Godfrey was irrelevant to any statutory aggravating circumstance. The psychiatrist, according to the record before us, testified in rebuttal to a defense witness who had previously testified as to Godfrey's mental condition. Moreover, we have not limited evidence of aggravating circumstances to only the statutory aggravating circumstance. OCGA §§ 17-10-2 (Code Ann. § 27-2503), 17-10-30 (b) (Code Ann. § 27-2534.1); *Zant v. Stephens,* 250 Ga. 97 (297 SE2d 1) (1982); *Fair v. State,* 245 Ga. 868 (4) (268 SE2d 316) (1980). At the resentencing trial there was no objection on the ground named here, and we find no error in permitting this testimony. In a separate section of the same memorandum Godfrey also contends that "gory" photographs and "graphic" description of the crime scene were irrelevant and should have been excluded. There was no objection during the resentencing trial on these grounds to testimony as to the crime scene. We see no reason to rule other than we did when this question was originally before us on direct appeal. See *Godfrey v. State,* 243 Ga. 302 (2), supra. There is no error here.

The alleged inflammatory closing remarks of the prosecutor of which appellant complains are not set out in the brief or otherwise identified. We are at a loss to determine in which portions of the prosecutor's closing argument appellant grounds his enumeration of error. Our review shows that the prosecutor reviewed the evidence and reiterated the state's appeal for the death penalty. He did not express his own opinion nor did he appeal to the fears and emotions of the jury. A dramatic appeal to legitimate emotional feelings is not constitutionally intolerable, and no more than that occurred here. See *Conner v. State,* 251 Ga. 113 (5) (303 SE2d 266) (1983).

As to the question of mitigating evidence, Godfrey's mem-

orandum appears to argue that Gregg v. Georgia, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976) and Lockett v. Ohio, 438 U. S. 586 (98 SC 2954, 57 LE2d 973) (1978) stand for the proposition that a penalty phase jury is entitled to hear any and all evidence which the defendant might submit as mitigating. This is an incorrect reading of Gregg and Lockett and neither case suggests such a vague and general standard. In Lockett a plurality concluded that the sentencer in death cases should not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and circumstances of the offense that the defendant proffers as a basis for a sentence of less than death. It noted in the same place, however, that nothing in the opinion limited the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense. Id. at 604. Godfrey's memorandum submits that it was error to exclude evidence of Godfrey's sale of his home subsequent to the murders and disbursement of the funds to his children, on the ground that these facts were relevant to Godfrey's character. We disagree and are not persuaded that it was error to exclude this evidence.

The issue of the admissibility of the testimony by the state psychiatrist who examined Godfrey is reviewed in section 5 of this opinion, supra. The testimony by a representative of the ACLU as to the frequency of death sentences in domestic murder cases was offered at the resentencing trial by Godfrey as relevant to the circumstances of the offense, one of the categories of mitigating evidence recognized in Lockett. However, it is this court, not the judge or jury, that is charged with the responsibility of conducting proportionality review. *Wilson v. State,* 250 Ga. 630 (12) (300 SE2d 640) (1983); *Blake v. State,* 239 Ga. 292 (236 SE2d 637) (1977). The resentencing court ruled that the evidence was irrelevant. We agree. There was no error of constitutional dimension in this ruling. The issue of whether Godfrey's in-custody statements to police were properly admitted is addressed in section 6 of this opinion, supra.

Godfrey presents neither evidence nor argument that the resentencing court abused its discretion in making any of the rulings complained of in this enumeration. His assertions amount to no more than a listing of disagreements with the court's rulings. There was no error in any of these rulings.

9. In his fifteenth enumeration, Godfrey finds error in the first trial court's refusal to excuse for cause during voir dire two jurors uncertain about whether they would accept the defense of insanity. Neither expressed any bias or prejudice against the defendant, but one said she had "qualms" about returning a verdict of not guilty by reason of insanity. The other juror said he was simply unsure of how

he would vote. In *Butler v. State,* 231 Ga. 276 (201 SE2d 448) (1973), we examined an analogous factual question and decided that where a juror has no bias or prejudice against the accused, nor any fixed opinion as to the guilt of the accused which would not yield to the evidence and the instruction of the court, there is no abuse of discretion in holding the juror competent. Conduct of voir dire is within the discretion of the trial court and the court's rulings are presumed proper in the absence of some manifest abuse of discretion. *Patterson v. State,* 239 Ga. 409 (238 SE2d 2) (1977). We find no abuse of discretion here and this enumeration is without merit.

10. In his seventeenth enumeration, Godfrey charges error in the exclusion from the venire at the guilt-innocence phase of his trial of a person conscientiously opposed to the death penalty. During voir dire, a prospective juror was excused for cause when he stated that he would refuse to consider capital punishment regardless of the facts of the case, and that he could not, under any circumstances, vote to sentence an accused to death.

Godfrey asserts that excluding this juror was error, citing Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). Witherspoon established that a juror may be excused for cause where he makes it clear that he would automatically vote against a sentence of death without regard to any evidence that might be developed at the trial of the case before him. The juror in the present case was sufficiently clear in his attitude toward the death penalty to meet the test set out in Witherspoon. *High v. Zant,* 250 Ga. 693 (3) (300 SE2d 654) (1983). There was no error and the juror was properly dismissed.

11. In his nineteenth enumeration Godfrey claims that he was denied his right to a fair and impartial jury at his resentencing trial when the court refused to excuse for cause two jurors who indicated their unwillingness to return a sentence of less than death in a case of murder with aggravating circumstances. The habeas corpus court found that the resentencing court committed harmless error in refusing to allow the first juror to answer certain questions as to his views on the death penalty and that the second juror did not state his firm belief in the death penalty for all persons convicted of murder and so it was not error to fail to excuse him for cause.

This enumeration presents the opposite side of the issue treated in Witherspoon v. Illinois, supra. In Witherspoon the U. S. Supreme Court ruled that the Sixth and Fourteenth Amendments prohibit carrying out a death sentence returned by a jury where the voir dire transcript indicates that the sentencing jury was chosen by excluding jurors for cause simply because they voiced general objections to capital punishment or expressed "conscientious scruples" or

religious convictions against its infliction. Id. at 514. In the present case, Godfrey contends that two potential jurors ought to have been dismissed for cause because of their expressed preference for the death penalty in a case involving murder with aggravating circumstances. Both jurors were later peremptorily struck by the defense, which exhausted its strikes.

Two jurors questioned prior to the juror whose voir dire is discussed here were asked respectively, "If the death penalty is provided for by statute as an option do you agree or disagree with that as an option in a murder case?," and "How do you feel about sitting on a jury in a death penalty case?" The court intervened and did not require an answer of either juror. Voir dire of the next juror subjected him to a lengthy debate involving counsel for the defense, the prosecutor, and the court over the broad and general form of defense counsel's questions. In order to best respond to Godfrey's assertion of error concerning this juror and the court's refusal to dismiss him for cause, pertinent parts of this exchange are set out here.

"Mr. Holmes [for the defendant]: In this case, as has been said, there won't be any deliberation really about guilty or innocent that's already been done, and the case is here for a sentencing to determine whether it's a life sentence or a death sentence. Do you feel that as a general proposition the death sentence is appropriate for first degree murder?

"Mr. Foster [for the state]: I'd like to object to that question.

The Court: I'm not going to require him to answer that. I think it's appropriate for me to instruct the jury. Prospective jurors, and I'll ask all of you to listen to this, all jurors. I will give you the instructions pertaining to the determination of whether or not a life sentence or death penalty will be recommended by the jury. You determine your recommendation and the court will pass the sentence. At the conclusion of the trial you will be charged in accordance with the principles which determine how you recommend, either life imprisonment or the death penalty, as follows. Under the laws of this state every person found guilty of murder shall be punished by death or by imprisonment for life. In all cases for which the death penalty may be authorized the law provides that the judge shall instruct the jury concerning mitigating circumstances or aggravating circumstances which the jury may consider in making the decision which will determine the punishment to be imposed for each offense. Mitigating circumstances are those which do not constitute justification or excuse for the offense in question but which in fairness and in mercy may be considered as extenuating or reducing the degree of moral culpability. Aggravating circumstances are those which increase the guilt or enormity of the offense, or add to its

injurious consequences. The law provides that when a person is convicted of an offense that may be punished by death the sentence of death shall not be imposed unless the jury verdict includes a finding beyond a reasonable doubt of at least one statutory aggravating circumstance and a recommendation that the death sentence be imposed.

"In arriving at your verdict in this case you would consider the evidence as to the mitigating circumstances which the defendant would contend exists in the case or any other mitigating circumstances you find from the evidence. You would also consider the evidence as to any statutory aggravating circumstances which the State contends exists in the case. If you find beyond a reasonable doubt that the State has proved the existence in this case of either one or more aggravating circumstances as contended by the State and as given you in charge by the court then you would be authorized to recommend the imposition of a sentence of death but you would not be required to do so. If you recommend the imposition of the sentence of death the court will sentence the defendant to death. If you should find beyond a reasonable doubt that the State has proved the existence in this case of one or more aggravating circumstances contended by the State and given you in charge by the court you would also be authorized to fix the punishment of the defendant at life imprisonment. This recommendation you may make for any reason that is satisfactory to you. If you do not find beyond a reasonable doubt that the State has proved the existence of any of the statutory aggravating circumstances, which the court will charge you, you would not be authorized to consider the penalty of death but fix the punishment at life imprisonment.

"Now, those are the instructions and the method of your determining whether or not, or in what manner, you would fix the punishment in this case.

"Now, in line with that I'll allow you to test in anything that would show their partiality or impartiality which would prevent them from following those instructions as jurors.

"Mr. Holmes: Mr. Powell, you no doubt listened to the court's charge, what would be the foundation for the court's charge in a case of this nature. Clearly death is a sentence that is an option in a murder case where aggravating circumstances have been found. Do you feel that murder, first degree murder, itself is enough of an aggravating circumstance to in general impose a death sentence?

"The Court: I'm not going to require him to answer that question. It is directly contrary to my instructions to them. I am going to assume that they will follow the instructions of the court both now and if they are selected as jurors.

"Mr. Holmes: Your Honor, we always assume that jurors, if selected, will follow the instructions of the court. But until they are selected I think as far as their personal opinions that may demonstrate bias we're entitled to go into a death sentence case rather than asking "would you follow the standard instructions, yes or no." I think we're entitled to go into the matter. I'm not trying to escape the trial or to delay the trial unnecessarily but I am convinced that that is a matter of the opinions of jurors that may or may not show partiality under the circumstances that must be inquired into rather than to ask a simple yes or no question "will you follow those instructions." That tells me nothing about their . . .

"The Court: . . . Ask your question and I'll rule on it.

"Mr. Holmes: Mr. Powell, if I can begin again. You've heard the court's instructions but I want to ask you something about your personal feelings in the matter. Do you feel that in general the death sentence is an appropriate sentence for a first degree murder?

"Mr. Foster: Your Honor, I object . . .

"The Court: . . . Well, that's too broad. I will not require the juror to answer that question.

"Mr. Holmes: Mr. Powell, if you sat in a jury and there was . . . just assume that there was evidence showing first degree murder and that there was evidence showing an aggravating circumstance. Do you feel personally that as a general matter that the death penalty would be an appropriate sentence?

"The Court: I wouldn't require the juror to answer that question. It is asking him to prejudge and I am ruling that it cannot be asked.

"Mr. Holmes: Your Honor, I'm not asking anybody to pre-judge . . .

"The Court: . . . Ask another question. I've just ruled on that.

"Mr. Holmes: I know the court has ruled on it but I suppose the court wants me to simply ask if they will follow all the instructions and be fair and impartial jurors, yes or no.

"The Court: If you need to elicit something that would determine the partiality of the juror or anything that would pertain to his qualifications to serve as a juror I will certainly allow those questions. I am holding that that particular question does not do that and is improper.

"Mr. Holmes: Mr. Powell, let me ask you another way. Are there any circumstances under which, assuming hypothetically not just this defendant but in general, assuming someone has been convicted of murder and that there are aggravating circumstances present in the evidence are there any circumstances under which you would not find that death was the appropriate sentence?

"Mr. Foster: Your Honor, I object to that question, it's just stated another way and is too broad and too general for the juror to answer as well as asking him to prejudge the case.

"Mr. Holmes: Your Honor, I think people have opinions about these things and that we're entitled to ask some, you know . . .

"The Court: . . . I think what you're doing is asking him if he would not follow the instructions of the court, if there are circumstances under which he would not follow the instructions of the court.

"Mr. Holmes: That's another way of putting it. I think we're entitled to know that.

"The Court: That's the way I'm putting it. I hold that the question is improper.

"Mr. Holmes: Mr. Powell, you say that you are not conscientiously opposed to capital punishment. I believe you responded to that by answering the court's general question. Do you have strong feelings about the necessity for the imposition of the death sentence as a general rule? Is the death penalty something that you think ought to be imposed more frequently in society than it is today?

"The Court: I would not require him to answer that question.

"Mr. Holmes: Your Honor, I fail to understand how in a death penalty case where a life is at stake how someone's opinion regarding the death penalty is not relevant. It's relevant for the State to ask if somebody is so opposed to it that they could not vote it under any circumstances. I think the other side of the coin is an appropriate line of questioning. I can't tell anything about their opinions without asking them.

"The Court: Qualification questions of course are not those asked by the State or those required by law and to qualify the jurors basically they must not be unalterably opposed to capital punishment in order to serve. That is mainly the foundation for their being considered as jurors. It would not open up the whole panorama of letting them philosophize in capital punishment and that is not something that I can allow.

"Mr. Holmes: Your Honor, we're seeking to ask a more narrow question than that.

"The Court: Let me hear it.

"Mr. Holmes: This is not a question of philosophy. It shows partiality. If a man or woman feels that the death sentence ought to be imposed for murder . . .

"The Court: . . . You're asking if he thinks it ought to always be allowed. I'll allow that. That's somewhat asking him if he would contravene the directions of the court but go ahead and ask him that.

"Mr. Holmes: What I'm trying to ask, Mr. Powell, I of course am not picking on you and this is something I'd rather not be doing. Honestly I had rather not be doing this.

"The Court: You don't have to apologize for asking questions. We don't . . . the jurors are directed under their duty to answer the questions properly and you don't have to apologize for asking the questions.

"Mr. Holmes: Do you feel as a general proposition that the death penalty ought to be imposed for first degree murder?

"Juror: I think so.

"Mr. Holmes: Are there any circumstances about the case or that may be in the law as the court gives you in charge that, in a particular case, that would cause you to be willing to consider the grant of mercy or the life sentence even though it is first degree murder with aggravating circumstances?

"The Court: I wouldn't require him to answer that. You're asking him to prejudge the factual situation that he does not know about. You're asking if there are any circumstances under which he would recommend life sentence?

"Mr. Holmes: Assuming it was a murder with aggravating circumstances, that he would consider a life sentence even though those factors were present.

"The Court: I have just given them the instructions that they could do that. I am holding that I expect the jurors, unless they tell me otherwise, that they will follow the instructions of the court. If they can't follow that instruction I will ask them to let me know now. I'm certainly assuming they can all follow the instructions unless they tell me they can't now.

"Mr. Holmes: Mr. Powell, if I can, I think, rephrase what the court is saying. The court has . . .

"The Court: . . . Just ask another question. You don't have to rephrase what I said.

"Mr. Holmes: Well, assume there's a murder, two murders with aggravating circumstances proved to your satisfaction would you be able to, considering your opinion previously stated, would you be willing or able to consider a sentence less than death under those circumstances and follow the law that allows it?

"Juror: No, I'd go for the death sentence.

"Mr. Holmes: The death sentence?

"Juror: Yes sir.

"Mr. Holmes: I would ask that Mr. Powell be excused Your Honor.

"The Court: I would overrule your request. He doesn't know the

evidence which is to be produced and that is why the question is basically improper. He is not supposed to have to analyze what the evidence is or might be."

Viewing the voir dire of this juror as a whole and considering the context in which the contested answers were given, it was not error for the resentencing court to fail to dismiss the juror. See *Hance v. State,* 245 Ga. 856 (6) (268 SE2d 339) (1980). The extended, persistent, and confusing questions asked the prospective juror failed to elicit a clear, adamant expression of a fixed opinion that would be unyielding in spite of law or evidence which required a contrary finding.[2] The defendant cannot create error by eliciting responses to questions that solicit the juror's views on evidence not yet presented and the law to be applied in the case at hand. The juror never stated that he would refuse to apply the law as charged or that he would not follow the court's instructions in considering all the evidence. Later, during voir dire of a subsequent juror, the court reminded the entire panel of the charge given the previous day as to consideration of aggravating circumstances in setting a sentence for murder. The judge then said: "Also you should consider any mitigating circumstances in determining whether or not you recommend a life sentence. You can and should consider the life sentence in any event based on the evidence. I would ask all of you if you have any pre-judgment that you could not follow those instructions if you're selected as a juror." None of the jurors responded and questioning continued.

A review of the entire voir dire examination does not show this juror to be so biased or irrevocably committed to the death penalty that he would ignore the court's instructions pertaining to the jury's sentence recommendation and impose the death penalty under all circumstances in which a murder conviction would be returned. See *Berryhill v. State,* 249 Ga. 442 (4) (291 SE2d 685) (1982). Contrary to the finding of the habeas court we find no error here.

The transcript of the voir dire of the second juror shows that he stated that although he believed death to be the appropriate penalty for a murder committed with aggravating circumstances, he also acknowledged that his mind could be changed.

"Mr. Holmes [for the defense]: In other words if there's a

---

[2] Without addressing the reverse Witherspoon issue directly, the U. S. Supreme Court has suggested that the same standard should apply to venire members whose dismissal is sought because of their views in favor of the death penalty as to those who oppose it. "A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U. S. 38, 44 (100 SC 2521, 2526, 65 LE2d 581) (1980).

conviction, which there is . . . I'm asking you a hypothetical question because we can't go into the facts of this case but if there's a conviction and aggravating circumstances involved present and proved to your satisfaction you would be unable to consider any sentence other than the death sentence?

"Juror: I think possibly not. I guess my mind could be changed but I don't think so.

"Mr. Holmes: You think that as a general proposition the death penalty is appropriate punishment for that crime?

"Juror: For first degree murder, yes. I think a person is responsible for their actions regardless of the conditions or whatever.

"Mr. Holmes: Your Honor, I would ask that Mr. Bright be excused. I think that he has been very honest with us and his statement is about as clearly as he can state that he would not consider . . .

"The Court: . . . Well, he didn't say he wouldn't consider it he said he thought . . . he indicated it would be more appropriate. I think as we go through this legal proposition again it would be helpful for me to charge this panel concerning the substance of what I gave all the jurors yesterday. Did all of you hear the charge which I gave yesterday directed to all of you and also the panel in the box?

(All jurors respond with a yes sir)

"The Court: At the time that you heard the charge did any of you feel that you could not follow that charge in sitting as jurors in the case?

(No response from the jurors)"

The attitude expressed by this juror does not show sufficient evidence of bias or unwillingness to consider the evidence in light of applicable law as charged by the court to require his dismissal for cause. *Westbrook v. State,* 242 Ga. 151 (3) (249 SE2d 524) (1978), cert. denied, 439 U. S. 1102 (99 SC 881, 59 LE2d 63) (1979). This enumeration is without merit.

12. In his twenty-first enumeration, Godfrey contends that this court improperly reviewed his sentence, resulting in a disproportionate and excessive sentence. He submits in support of this enumeration that in the "opinions of this Court upholding death sentences in several other 'domestic murder' and multiple murder cases, the Court cited appellant's case as being a proper case for the imposition of a sentence of life imprisonment." No cases are cited in the appellant's brief as authority for this observation and there are none.

We have previously reviewed Godfrey's sentence pursuant to OCGA § 17-10-35 (Code Ann. § 27-2537) on direct appeal in order to determine whether the sentence of death was excessive or

disproportionate to the sentences imposed in similar cases. *Godfrey v. State,* 248 Ga. 616, supra. We decline to take it up again here. Therefore, we find no merit in this enumeration.

13. In his twenty-second enumeration Godfrey contends that the method of execution in Georgia, electrocution, is unconstitutional in that it violates the Eighth Amendment guarantee against cruel and unusual punishment. The U. S. Supreme Court long ago rejected this contention and has more recently refused to reconsider its decision. See In re Kemmler, 136 U. S. 436 (10 SC 930, 34 LE 519) (1890); *Collier v. State,* 244 Ga. 553 (18) (261 SE2d 364) (1979), cert. denied, 445 U. S. 946 (100 SC 1346, 63 LE2d 781) (1980).

14. Finally, Godfrey claims that denial of his pre-habeas corpus hearing motion for funds to support the preparation and presentation of his case violates his right to equal protection and due process of law. Petitioner fails to cite any authority in support of his contention. To the contrary, there are decisions of this court resolving this issue of public funds for indigents filing habeas corpus petitions against the appellant's position. See *Stephens v. Balkcom,* 245 Ga. 492 (265 SE2d 596) (1980); *Harris v. Hopper,* 243 Ga. 244 (253 SE2d 707) (1979). In light of these cases denial of such funds does not violate the constitutional right cited by Godfrey and we find no merit in this enumeration.

*Judgment affirmed. All the Justices concur, except Hill, C. J., and Gregory, J., who dissent.*

DECIDED NOVEMBER 4, 1983 —
REHEARING DENIED NOVEMBER 29, 1983.

*Joseph M. Nursey,* for appellant.
*Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

HILL, Chief Justice, dissenting.

I dissent to the imposition of the death penalty in this case for the reasons stated in my dissenting opinion in *Godfrey v. State,* 248 Ga. 616, 625 (284 SE2d 422) (1981).

GREGORY, Justice, dissenting.

In Division 11, this court considers Godfrey's contention that the trial court erred by refusing to excuse for cause two potential jurors who indicated their unwillingness to return a life sentence in a case of murder with aggravating circumstances. Despite having ample opportunity to raise this issue in his direct appeal, Godfrey failed to do so. This claim of error is thus presented to us for the first

time on collateral review, two years after Godfrey's death sentence was affirmed on direct review. I would prefer not to allow collateral review of a claim which could so easily have been resolved previously. However, the law applicable to this habeas corpus case does not allow that choice. Having considered, as I must, Godfrey's contention on its merits, I find that I cannot agree with the majority that the trial court's refusal to excuse the first of these two potential jurors was not error. Reluctantly, I dissent to Division 11 and the judgment.

It is well settled that a juror who is unable to impose a death sentence is subject to disqualification in a case in which the state is seeking the death penalty. Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968). This court fails to resolve the important question of whether "the same standard should apply to venire members whose dismissal is sought because of their views in favor of the death penalty as to those who oppose it." Perhaps for this reason, the court also fails to delineate the scope of proper questioning in this regard.

In fact, the basis for this court's finding of no error is altogether unclear. The court holds that a defendant cannot "create error" by improper questioning; thus implying that the questioning was improper and that, no matter what the juror's answer to an improper question, he is not disqualified. But the court also implies that the juror's answers were not disqualifying in any event. Then the court suggests that even if the answers were, in themselves, disqualifying, the juror was rehabilitated. My dissent is premised upon my disagreement with all of these possible conclusions and upon my belief that the same standard *should* apply to potential jurors whose dismissal is sought because of their views in favor of the death penalty as to those who oppose it.

1. In my view, a juror who is unable to decide a case on its merits is not qualified to serve. Thus, a juror who is unable to impose a death penalty when the death penalty is authorized, regardless of the evidence, is subject to excusal for cause. By the same token, a juror who is unable to consider the imposition of a life sentence when a life sentence is authorized, regardless of the evidence, should be excused for cause upon challenge by the defendant.

2. Voir dire should allow both parties an opportunity to ascertain the ability of prospective jurors to decide the case on its merits, with objectivity and freedom from bias and prior inclination. *Whitlock v. State,* 230 Ga. 700 (198 SE2d 865) (1973). As we stated in *Jordan v. State,* 247 Ga. 328 (276 SE2d 224) (1981), " 'after the usual voir dire questions have been put by the court, . . . the counsel for either party shall have the right to inquire of the individual jurors examined touching any matter or thing which would illustrate any

interest of the juror in the cause, including any opinion as to which party ought to prevail.... Although a juror may have been acceptable ... when questioned by the court, the juror may be shown to be partial when questioned by the state or defense and if such showing is made, the juror should be stricken for cause." Id. at 338-339.

After ruling on several occasions that Godfrey's attorney could not ask the juror in question "if there are circumstances under which he would not follow the instructions of the court," the trial court finally allowed counsel to ask, "[w]ell assume there's a murder, two murders with aggravating circumstances proved to your satisfaction, would you be able to, considering your opinion previously stated, would you be willing or able to consider a sentence less than death under those circumstances and follow the law that allows it?"

The majority implies that this question was improper because it solicited "the juror's views on evidence not yet presented and the law to be applied in the case at hand." I fail to see how the question solicited the juror's views on the law except as it attempted to ascertain whether the juror would be able to follow the law, which, in my view, was not improper. The only items of *evidence* mentioned are: "two murders" and "aggravating circumstances."

I realize that questions incorporating facts yet to be proved are often improper. *Waters v. State,* 248 Ga. 355 (3) (283 SE2d 238) (1981). Neither party is entitled, as of right, to outline all the evidence and then ask a juror what his verdict would be on that evidence. Ibid. However, except in cases of treason or aircraft hijacking, the death penalty may not be imposed unless a murder has been committed and statutory aggravating circumstances have been proven. OCGA § 17-10-30 (c) (Code Ann. § 27-2534.1); Coker v. Georgia, 433 U. S. 584 (97 SC 2861, 53 LE2d 982) (1977). A question which merely inquired whether a juror could consider a sentence less than death would be useless. Presumably, no one would contend that the death penalty should be imposed in *all* criminal cases. The important question is whether a juror authorized to impose the death penalty would automatically do so.

I would hold that the only portion of counsel's question which was possibly objectionable was his reference to "*two* murders." In my view, counsel was entitled to inquire whether the juror was "willing or able to consider a sentence less than death" in a case involving murder with aggravating circumstances.

3. I cannot agree with the majority's implicit suggestion that a juror's answer to a question that may be, in part, objectionable, will not, under any circumstances, disqualify the juror. In *Aycock v. State,* 188 Ga. 550 (12) (4 SE2d 221) (1939), this court recognized that an answer of a juror might disqualify him even if the question were

improper. As we noted, if the allegedly improper questions had not been posed, "and the prospective jurors had voluntarily stated their opposition to a conviction upon circumstantial evidence, it would have been the duty of the court to disqualify them." Id. at 569. See also, *Bradham v. State,* 243 Ga. 638 (256 SE2d 331) (1979) (reversing 148 Ga. App. 89 (250 SE2d 801) (1978); s.c. after remand, 150 Ga. App. 540 (258 SE2d 252) (1979)).

4. I cannot agree with the majority's finding that the juror's answer was not "a clear, adamant expression of a fixed opinion that would be unyielding in spite of law or evidence which required a contrary finding." The majority misstates the test for disqualification. If a defendant is convicted of murder (as Godfrey had already been at the time of this voir dire) and a statutory aggravating circumstance is shown, the jury may, in its discretion, impose a death or a life sentence; neither is required. I believe the test should be whether a juror authorized to impose a death penalty would automatically do so, regardless of the evidence.

To counsel's query, ". . . would you be willing or able to consider a sentence less than death under those circumstances and follow the law that allows it?" — the juror answered, "No, I'd go for the death sentence."

The juror's answer could not have been clearer. He was neither willing nor able to even consider a life sentence or to follow the law that allows it. I would hold that he was disqualified to serve in this case.

5. Under the circumstances of this case, I cannot agree that the juror was rehabilitated. The majority notes that the day after this juror underwent voir dire, the court reminded the entire panel that, "You can and should consider the life sentence in any event based on the evidence. I would ask all of you if you have any pre-judgment that you could not follow those instructions if you're selected as a juror." It is doubtful that a negative answer to this question could rehabilitate the juror in any event, in view of our holding in *Cofield v. State,* 247 Ga. 98 (2) (274 SE2d 530) (1981), that it is not sufficient that a juror be willing to "consider" the death penalty if he or she is committed to automatically vote against the death penalty after having "considered" it. Moreover, in this case, we cannot know for sure that the juror in question was present when the panel was asked the rehabilitative question.

6. I would hold that the trial court erred by refusing to exclude the aforementioned juror and would reverse.